JUDGE SEIBEL

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ELIZABETH BINGHAM-PERRY, | ) | CIVIL ACTION NUMBER |
| Plaintiff, | ) | 12 CV 5294 |
| v. | ) | JURY TRIAL DEMANDED |
| JEFFREY R. PERRY, | ) | |
| Defendant. | ) | |

RECEIVED JUL -9 2012 U.S.D.C. S.D. N.Y. CASHIERS

## COMPLAINT

Plaintiff, Elizabeth Bingham-Perry (hereafter, "Elizabeth"), by undersigned counsel, hereby complains of the Defendant, Jeffrey R. Perry (hereafter, "Jeffrey"), as follows:

### I.   NATURE OF CLAIM

1. Elizabeth and Jeffrey are in the process of obtaining a divorce after 23 years of marriage during which Jeffrey acquired a substantial fortune as a highly successful hedge fund manager on Wall Street.

2. Jeffrey's career has been marked by repeated criminal activity in his quest to amass his fortune.

3. Jeffrey has continued his pattern of using the U.S. Mails and wires to perpetrate frauds and enrich himself in the divorce action. There he has filed and mailed papers with the court which falsely understate his net worth, a scheme to hide millions of dollars from Elizabeth (hereafter, "the Asset Concealment Scheme" or "the Scheme").

4. This pattern of fraudulent conduct has damaged at least two parties over the last decade. Accordingly, Elizabeth asserts a civil RICO claim against Jeffrey for the damages she has suffered from the Scheme.

## II.   PARTIES, JURISDICTION, & VENUE

5. Elizabeth is a citizen of New York State and resides in Scarsdale.

6. Jeffrey is a citizen of New York State and resides in White Plains.

7. This Court has jurisdiction of this case as a federal question, pursuant to RICO's civil damages provision, 18 U.S.C. §§1964(c) and 28 U.S.C. 1332. The Court has supplemental jurisdiction of Count II as it arises from the same facts and transactions.

8. Venue is proper in this Court because the parties reside here and the relevant acts occurred here.

## III.   COUNT I: RICO CLAIM AGAINST JEFFREY

### A. THE ASSET CONCEALMENT SCHEME

9. Jeffrey and Elizabeth were married in 1989. At the time of the marriage they had less than $1 million in combined assets.

10. During the marriage Jeffrey became a highly successful hedge fund executive, most recently employed by Third Point LLC in New York City.

11. Jeffrey acquired at least $40 million in assets during the marriage. He invested most of these assets in partnerships, hedge funds, certificates of deposit, retirement accounts, including, Elizabeth has learned, despite Jeffrey's concealment, an account in the Cayman Islands. His concealment scheme began as long ago as 2005, when he

first retained a divorce lawyer and began to move some of his assets into secret accounts. This entailed interstate or foreign wire transfers. Elizabeth does not have access to the details. Jeffrey has continued the Scheme until the present time by keeping these assets concealed from Elizabeth and the divorce court. He sued Elizabeth for divorce in 2010. (*Perry v. Perry,* Index No. 30078/-10 (Supreme Court of Westchester County, N.Y.)).[1]

12. On his Net Worth Statement (hereafter, "the NWS"), a mandatory disclosure of all assets of any kind required by New York law in divorce actions, which Jeffrey prepared and signed under penalties of perjury, he intentionally omitted significant assets: an account at Fortis Bank in the Cayman Islands, a Fidelity Investments account, a Charter Bank account, and shares in the following mutual/hedge funds: Arden Institutional Advisors LP, Black Bear Fund II, LLC, Central States Theatre Corp., Empress Theatres, and Piney Reach Real Estate, LLC. Elizabeth believes the value of these assets is substantial, well over $1 million. She is entitled to an equitable distribution of them under New York law.

13. In addition to using wire transfers to move his money offshore and out of Elizabeth's reach, Jeffrey used the U.S. Mail to perpetrate the Asset Concealment Scheme by causing the false and fraudulent NWS to be sent to Elizabeth and to the Supreme Court by his lawyer in May 2011. The transmittal of the NWS to the court and to Elizabeth was an essential step in the scheme. Not only is the NWS required to be filed but it is intended to lull Elizabeth into a false sense that Jeffrey is complying with the law to disclose all marital property.

14. This scheme violates 18 U.S.C. §§1341 and 1343, forms of "racketeering activity."

---

[1] He voluntarily dismissed the case. It was refiled in 2011.

## B. THE FAIRFAX SCHEME

15. While Jeffrey was employed at Third Point LLC as a trader and manager he reported directly to the Chief Executive Officer, Daniel S. Loeb. At some point in early 2003 Jeffrey became involved in a scheme to destroy Fairfax Financial Holdings Limited (hereafter, "Fairfax"), a financial services firm, as detailed below.

16. Between 2003 and 2006 Jeffrey was part of a group of powerful hedge fund executives that made fortunes selling short positions in certain companies. One of these companies was Fairfax. In 2003 Jeffrey entered into an agreement with numerous others, including but not, limited to, Daniel Loeb, Spyro Contogouris, and Max Bernstein, collectively controlling over $40 billion in assets, for the purpose of causing a decline in the price of Fairfax's stock through the dissemination of negative and false information about the company. As short sellers of Fairfax, all of the conspirators would profit by a decline in the value of its common stock.

17. Fairfax was thinly traded with an average daily volume of about 77,000 shares, a significant portion of which was attributable to short sales. Additionally, the members of this group had collaborated for years in the hedge fund industry.

18. While Elizabeth does not purport to detail every act of the conspiracy, she details many in order to demonstrate that Jeffrey has agreed to a long-running scheme of using the U.S. mails and wires to cause financial harm to others, in this instance, Fairfax.

19. Though the conspirators delegated tasks they all agreed with the objective of the conspiracy and each undertook specific acts which would involve the uses of the U.S. Mails and wires in order to harm Fairfax. And each knew the conspiracy could not be

successful without the massive dissemination of information by means of interstate wires (primarily e-mail and fax), the U.S. Mail and overnight courier services, such as Fed Ex.

20. Accordingly, David Rocker, principal of Rocker Partners, LP., disseminated materially false information indicating Fairfax was on the verge of financial collapse, was having a liquidity crisis, was borrowing heavily to conceal its liquidity crisis, that Fairfax was misleading regulators about the health of its subsidiaries by paying those companies' operating costs, Fairfax was using offshore subsidiaries to illegally move money from regulated companies, and that Fairfax was engaged in fraudulent accounting. He successfully promoted this information to financial reporters and other short sellers in order to execute the scheme. Jeffrey approved of Rocker's actions.

21. One such negative story appeared in TheStreet.com on January 15, 2003 which led to a negative report by conspirator John Gwynn containing false information. Gwynn disseminated his negative report to reporters and investors around the nation and the world by interstate wire. Jeffrey approved of Gwynn's actions.

22. By January 30, 2003 Fairfax's stock had fallen 32% to an 8-year low on a record volume of 14 times higher than normal.

23. Gwynn issued another false report about Fairfax on March 10, 2003 which alleged the company (largely an insurer) was under-reserved for asbestos and environmental exposure and the company was insufficiently liquid to survive the year.

24. This report was spread through interstate wires to investors and reporters around the world.

25. On April 3, 2003 Gwynn issued another false report about Fairfax challenging the valuation of one of its subsidiaries and that another was late in filing its financial statements. Gwynn caused this report to be disseminated to investors and reporters by interstate wires.

26. On May 6, 2003 Gwynn issued a another false report about Fairfax alleging the company failed to disclose its asbestos reserves and that it was pursuing a strategy of acquiring troubled property and casualty companies. Gwynn caused this report to be disseminated to investors and reporters through interstate wires.

27. Gwynn made further reports of false information to harm Fairfax on the following dates, all disseminated through interstate wires to reporters and investors: May 14, 2003, August 26, 2003, October 8, 2003, November 26, 2003, February 24, 2004, March 12, 2004, August 9, 2004, August 11, 2004, August 19, 2004, August 27, 2004, September 7, 2004, October 5, 2004, October 29, 2004, November 3, 2004, November 24, 2004, May 2, 2005, June 28, 2005, July 13, 2005. In addition, all such reports were also covered by TheStreet.com which re-published the false information by interstate wires to further the conspiracy.

28. In mid 2005 Daniel Loeb, as part of the conspiracy, agreed to hire Contogouris to develop and disseminate false information about Fairfax to further the scheme. They contacted analysts, rating agencies and investors in order to falsely inform them that each had independently discovered that Fairfax was insolvent and was concealing the insolvency through accounting frauds on the magnitude of the Enron fraud. These contacts were made largely by interstate wires and emails with the intent of carrying out the scheme. Jeffrey approved of Loeb's actions.

29. As a result of the conspiracy the website Stocklemon.com, targeted to short sellers, issued a report on October 21, 2005 entitled, "Where There's Smoke There's Fire… Could Fairfax Financial Be The Next Refco???" This report restated the conspirators' information.

30. In November 2005 another member of the conspiracy sent packages to Fairfax investors in order to intimidate them. One was delivered from New York to a Reverend Parker, the minister of a church in Toronto, which owned Fairfax stock, warning of "massive money laundering schemes perpetuated by Marty Frankel and the massively convoluted paper shuffle created by Mr. [Prem] Watsa [a Fairfax board member] through his public vehicle Fairfax Financial Holdings Ltd…Be aware Father, be skeptical and ask Mr. Watsa to make confession."

31. A similar document was e-mailed to Mr. Watsa at his office by Contogouris under an alias, "Monty Gardener" on the same day. These documents were prepared by Bernstein at Exis' New York office in order to undermine Mr. Watsa's reputation for financial soundness and hurt Fairfax.

32. Also on the same day a phone call for Mr. Watsa came from a number listed to Exis' New York office, and a caller identified as David Sandler left a message to, "tell Watsa that when he goes to jail next year, we will visit him and bring him some treats."

33. On November 10, 2005 Contogouris, using his "Monty Gardener" alias, e-mailed Watsa stating, "Ex-Refco CEO Bennett charged with securities fraud, other charges in 8-count indictment."

34. On December 19, 2005 Watsa's executive assistant received two e-mails from "Dick Tracy," transmitting an anonymous letter addressed to her at "Fairfax Financial" and threatening her with being involved in a criminal enterprise. It stated:

    "The attached documents are being sent to you out of concern for your unwitting participation in possibly very serious federal crimes committed by Mr. Prem Watsa..."

    The document went on to accuse Mr. Watsa of perpetuating a "massive money laundering scheme... through Fairfax... One has to ask how this unbelievably meteoric rise of this roll up of garbage insurance companies could happen without Prem's close team working together to create and maintain a course of conduct that is in fact, a premediated and sustained deception of investors..." This email was prepared and sent by Max Bernstein to further the conspiracy. Jeffrey approved of these efforts to intimidate Fairfax investors.

35. In about April 2006 Daniel Loeb and Jeffrey began to trade in the derivative securities such as credit default swaps that would increase in value in response to the adverse news and business developments the conspirators were manufacturing about Fairfax.

36. In May 2006 Daniel Loeb directed Jeffrey to prepare a presentation for reporters which would depict Fairfax as the next Enron. Jeffrey did so, coordinating the delivery of considerable data to the New York Post by e-mail. As a result, the New York Post ran a story on July 22, 2006 entitled, "Island-hopping Insurer's Offshore Deals Eyed by Feds." The story repeated the conspirators' false allegations of financial improprieties at Fairfax and its subsidiary Crum & Forster.

37. Accordingly, Jeffrey conspired to commit many instances of disseminating false information about Fairfax in order to harm it and enrich himself from 2003-2006. This scheme violated the mail and wire fraud statutes, 18 U.S.C. §§1341 and 1343, both forms of "racketeering activity" pursuant to 18 U.S.C. §1961(B). Elizabeth alleges the Fairfax Scheme in detail in order to establish that Jeffrey has committed or conspired to commit a pattern of racketeering activity in the last decade. Moreover, the schemes are related in that Jeffrey used the U.S. Mails and wires to mislead people in order to enrich himself and did so through Third Point LLC.

### C. THE THIRD POINT LLC ENTERPRISE

38. Jeffrey conspired to commit the Fairfax Scheme as a member of Third Point LLC, a Delaware corporation, where he was employed and reported to the Chief Executive Officer, Daniel Loeb. Third Point LLC affects interstate commerce through its trading activities and nationwide clientele.

39. In addition, Jeffrey was able to commit the Asset Concealment Scheme using Third Point's network of banking connections in the Cayman Islands to move and conceal his assets.

40. Accordingly, Jeffrey has participated in the affairs of Third Point LLC through a pattern of racketeering activity, the two schemes.

### D. ELIZABETH HAS BEEN DAMAGED BY JEFFREY'S RACKETEERING ACTIVITY

41. Elizabeth has been damaged directly by the Asset Concealment Scheme because she cannot obtain her equitable distribution of the couple's marital property without its disclosure. Moreover, each day she is deprived of her share of these assets deprives her of income and interest from the use of the assets Jeffrey is concealing. Furthermore, the scheme has caused Elizabeth attorney's fees to bring this action.

42. Accordingly, Elizabeth asserts a claim against Jeffrey for damages he has caused her by the Asset Concealment Scheme, which violates 18 U.S.C. §1962(c). In other words, Jeffrey has damaged Elizabeth by the Scheme, which includes the mailing of the NWS, through the Third Point LLC enterprise. Jeffrey has also committed the Fairfax Scheme, which, when combined with the Asset Concealment Scheme, amounts to a "pattern of racketeering activity."

Wherefore, Elizabeth demands judgment against Jeffrey for three times the damages he has proximately caused her through the commission of the Asset Concealment Scheme, plus attorney's fees, plus pre-judgment interest, plus costs, and an injunction against him from further perpetrating the Asset Concealment Scheme, and any other relief to which she is entitled.

## COUNT II: BREACH OF FIDUCIARY DUTY

Elizabeth realleges ¶¶1-13 and 41 of Count I here.

43. By committing the Asset Concealment Scheme Jeffrey has breached his fiduciary duty to Elizabeth to truthfully disclose all of his assets on the NWS. He has been unjustly enriched.

44. Elizabeth has been damaged by this breach, as detailed in ¶42. This is a violation of New York common law.

Wherefore, Elizabeth seeks judgment against Jeffrey for all of the damages he has caused her, that a constructive trust be imposed on the proceeds of any assets which he has disposed of, for prejudgment interest, for punitive/exemplary damages, and any other relief to which she is entitled.

Dated: July 9, 2012

By: _____
Clifford James
Attorney Bar Code: CJ 5037
Law Offices of Clifford James
260 Madison Avenue, 17th Floor
New York, NY 10016-2401
T: (212) 532-6333
cjames@cjtoplaw.com

Howard W. Foster, *pro hac vice counsel*
Matthew A. Galin
Foster PC
150 North Wacker Drive, Suite 2150
Chicago, Illinois 60606
T: (312) 726-1600
hfoster@fosterpc.com
mgalin@fosterpc.com

11

Request for Pro hac vice Admission
forthcoming